**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 2 7 2018 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

LG CAPITAL FUNDING, LLC,

                Plaintiff,

    v.

ONE WORLD HOLDING, INC.,

                Defendant.

------------------------------------------------------------x

15-CV-698 (SJ)(JO)

**MEMORANDUM
AND ORDER**

APPEARANCES:

GARSON, SEGAL, STEINMETZ, FLADGATE LLP
164 West 25th Street, Suite 11R
New York, New York 10001
By:    Michael Steinmetz
*Attorney for Plaintiff*

MARC JONAS BLOCK
40 River Road, Suite 19H
New York, New York 10044
*Attorney for Defendant*

**JOHNSON**, Senior District Judge:

        Plaintiff LG Capital Funding, Inc. ("Plaintiff" or "LG") brings this diversity

action against defendant One World Holdings, Inc. ("Defendant," sometimes

referred to by its former ticker symbol, "OWOO"), principally alleging that

Defendant breached its obligations under three convertible promissory notes by,

*inter alia*, failing to convert part of the principal of, and interest from, one of the

notes into 3,707,681 shares of Defendant's Common Stock and failing to redeem

the notes on the "Maturity Date" specified therein. After Plaintiff successfully

moved for preliminary injunctive relief, and after Defendant failed to answer or move to dismiss Plaintiff's complaint (the "Complaint"), Plaintiff moved for a default judgment, a permanent injunction, and contempt sanctions on the ground that Defendant had failed to place the 3,707,681 shares in escrow as ordered by the Court. These motions were respectfully referred to Magistrate Judge Orenstein for a report and recommendation.

On August 6, 2015, Judge Orenstein issued his report and recommendation (the "R&R"), which recommended granting a default judgment with respect to Plaintiff's breach of contract claim and awarding money damages totaling $284,500.97. With respect to one of the Notes, the R&R recommended enforcing a liquidated damages clause which provided that upon certain breaches of Defendant's obligation to convert principal and interest into shares, Defendant would pay Plaintiff a "Default Sum" (essentially the outstanding principal and accrued interest, plus "Default Interest") multiplied by two (the "2.0 Multiplier"). The R&R also recommended denying the permanent injunction on the ground that Plaintiff had not establish that it had complied with certain conditions precedent to converting principal and interest into shares, and denying the contempt motion because it sought the same kind of injunctive relief. Both Plaintiff and Defendant timely objected to the R&R, with Plaintiff principally challenging the recommendation regarding injunctive relief and Defendant arguing that the 2.0 Multiplier was usurious and against public policy. For the reasons set forth below,

the R&R is adopted except with respect to that portion which recommended the denial of permanent injunctive relief.

## BACKGROUND

### A. The Notes

This case involves three convertible promissory notes issued by Defendant to Plaintiff (the "Notes"), which are attached to the Complaint as Exhibits A-C.[1] Defendant issued the first of the three (the "First Note") on or about July 23, 2013, upon its receipt of $62,000. *See* Complaint, ¶ 5 & Ex. A, p. 1. It issued a nearly identical instrument (the "Second Note") on or about October 25, 2013, upon its receipt of $52,000. *See id.*, ¶ 6 & Ex. B, p. 1.

The last of the Notes (the "Third Note") is a restatement of a note which was originally issued to non-parties, who assigned it to Plaintiff on October 25, 2013. When it was restated, the principal on the Third Note was $50,000. At only 10 pages long, the Third Note is about half the length of the other two, but contains some of the same contractual provisions. All three Notes expressly provide that they "shall be governed by and construed in accordance with the laws of the State of New York ...." First & Second Notes, § 4.6; Third Note, § 3.6.

---

[1] A convertible promissory note is a debt instrument that converts to equity in the company that issues it when certain conditions outlined in the promissory note are met. The notes are often issued by new business ventures, which might have difficulty obtaining more conventional business loans. At the time the notes in this case were issued, Defendant was a two-year-old start-up engaged in the production of multi-cultural dolls.

### 1. The Conversion Right

In each of the three Notes, Defendant promises to repay a principal amount, plus interest calculated at the rate of 8% per annum, nine months after the "Issue Date" —the date on which the note was issued (or restated, in the case of the Third Note). However, each note provides that during a specified period, Plaintiff has the right to convert any or all of the outstanding principal and accrued, unpaid interest into shares of Defendant's Common Stock. If Plaintiff exercises this "conversion right," Plaintiff receives the shares at a 50% discount.

The duration of the conversion right varies depending on the note. The First and Second Notes provide that Plaintiff can exercise the conversion right "at any time commencing one hundred eighty (180) days from the Issue Date ...." First & Second Notes, § 1.1. The Third Note provides that the conversion right can be exercised beginning on the Issue Date. *See* Third Note, § 1.1. However, all three Notes provide that the right does not end until "the later of: (i) the Maturity Date and (ii) the date of payment of the Default Amount (as defined in [the Note])." All Notes, § 1.1.

All three notes contain in Section 1.4(a) a provision entitled "Mechanics of Conversion," which specifies the manner in which a Holder can exercise the conversion right. This section provides, in pertinent part: "[T]his Note may be converted by the Holder ... by ... submitting to the Borrower a Notice of Conversion ...." All Notes define the term "Notice of Conversion" to mean a

4

notice "in the form attached [to the Note] as Exhibit A," *id.*, § 1.1, and the term

"Borrower" to mean Defendant One World Holdings, Inc., *id.*, p. 1. In addition,

all Notes provide that all notices required or permitted to be sent to Defendant,

whether by facsimile or otherwise, must be addressed to the attention of its Chief

Executive Officer. First & Second Notes, § 4.2; Third Note, § 3.2.

All three Notes make clear that Defendant's conversion obligation is

conditioned on Plaintiff's compliance with the provisions of Section 1.4(a). The

Notes provide:

> Upon receipt by the Borrower from the Holder of a
> facsimile transmission (or other reasonable means of
> communication) of a Notice of Conversion meeting
> the requirements for conversion as provided in ...
> Section 1.4, the Borrower shall issue and deliver or
> cause to be issued and delivered to ... the Holder
> certificates for the Common Stock issuable upon such
> conversion within three (3) business days after such
> receipt ....

First & Second Notes, § 1.4(d); Third Note, § 1.4(c). The Notes further provide:

> Upon receipt by the Borrower of a Notice of
> Conversion, the Holder shall be deemed to be the
> holder of record of the Common Stock issuable upon
> such conversion, the outstanding principal amount
> and the amount of accrued and unpaid interest on this
> Note shall be reduced to reflect such conversion, and,
> unless the Borrower defaults on its obligations under
> this Article I, all rights with respect to the portion of
> this Note being so converted shall forthwith terminate
> except the right to receive the Common Stock or
> other securities, cash or other assets, as herein
> provided, on such conversion. If the Holder shall
> have given a Notice of Conversion as provided
> herein, the Borrower's obligation to issue and deliver

5

> the certificates for Common Stock shall be absolute
> and unconditional ....

First & Second Notes, § 1.4(e); Third Note, § 1.4 (d).

In order to ensure the availability of enough Common Shares to enable Defendant to honor its conversion obligations, all three Notes contain reserve requirements. The First and Second Notes both require Defendant "at all times to have authorized and reserved four times the number of shares that is actually issuable upon full conversion of the Note ...." First & Second Notes, § 1.3. These two notes specifically provide that "if the Borrower shall ... make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved ... for conversion of the outstanding Notes." *Id.* The Third Note does not contain either of these provisions, but requires the Borrower to "covenant[ ] that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares ... to provide for the issuance of Common Stock upon the full conversion of this Note ...." Third Note, § 1.3.

## 2. The Events of Default

Although all of the Notes list over a dozen "Events of Default," only a few such events are relevant here. First, the Notes provide that Defendant's failure "to

6

pay the principal hereof or interest thereon when due" under the terms of the Note constitutes an "Event of Default." First & Second Notes, § 3.1; Third Note, § 2.1. Second, Defendant is in default if it "fails to issue shares of Common Stock to the Holder (or announces or threatens ... that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note ...." First & Second Notes, § 3.2; Third Note, § 2.2. Third, it is an "Event of Default" if Defendant "breaches any material covenant or other material term or condition contained in this Note ... and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder." First & Second Notes, § 3.3; Third Note, § 2.3.

A fourth relevant Event of Default is listed in the First & Second Notes, but not in the Third Note. These two notes provide that it is an Event of Default if "[t]he Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder." First & Second Notes, § 3.14. In addition, only the First and Second Notes contain a "Cross-Default" provision which states that a default under one of the Notes will constitute a default under all of the Notes. First & Second Notes, § 3.16.

### 3. The Damages Provisions

The methods for calculating damages vary depending on the note and the Event of Default. All three Notes provide that if Defendant fails to pay the principal and interest thereon at the Maturity Date, the Defendant "shall pay to the

7

Holder ... an amount equal to the Default Sum ...." First & Second Notes, Art. III; Third Note, Art. II. A "Default Sum" is defined in the First and Second Notes as consisting of the outstanding principal owed on the Note, the accrued and unpaid interest on that amount, the "Default Interest," and "any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g)" of the Note. First & Second Notes, Art. III. "Default Interest" is calculated at the rate of 22% per annum and is to be paid on the principal and interest "from the date due ... until the same is paid." *Id.*, p. 1.

In all three Notes, the damages for a breach of Defendant's conversion obligations depend on the cause of the breach. If the breach is *not* due to a failure to maintain the reserves required in section 1.3 of all three Notes, and the Defendant fails to deliver the shares within three days after the Deadline, Defendant "shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that [it] fails to deliver such Common Stock." First & Second Notes, § 1.4(g); Third Note, § 1.4(f). Conversely, if the breach *is* due to a failure to maintain the reserves required in section 1.3, the First and Second Notes provide that Defendant "shall pay to the Holder ... an amount equal to ... the Default Sum ... multiplied by ... two ...." First & Second Notes, § 1.3 & Article III. This provision does not appear in the Third Note.

In the case of all other Events of Default, the First and Second Notes require Defendant to pay "150% times" the Default Sum or the "parity value" of that

amount, whichever is greater.[2]  First & Second Notes, Art. III.  The Third Note

requires the Defendant to pay "150% times" the "Default Amount," which is

calculated in the same manner as the Default Sum is calculated under the First and

Second Notes.  Third Note, Art. II.  The Third Note does not mention "parity

value," but provides that "[i]f the Borrower fails to pay the Default Amount within

five (5) business days of written notice that such amount is due and payable," the

Holder has the option to require the Borrower, upon written notice, to immediately

convert the Default Amount into shares of Common Stock.  *Id.*

**B. The Complaint in this Case**

In February 2015, Plaintiff commenced this action, alleging that Defendant

breached its obligations under the Notes in various respects.  First, the Complaint

alleges that Defendant violated Section 3.2 of the First Note by refusing to deliver

shares of Common Stock after Plaintiff exercised its conversion right in accordance

with the terms of Section 1.1 of the Note.  Specifically, Plaintiff alleges that on

November 11, 2014, Plaintiff "duly submitted a Notice of Conversion to OWOO,"

seeking to convert $6,800 of the principal and $1,233.21 of unpaid, accrued interest

into 3,707,681 shares of Defendant's Common Stock.  Complaint, ¶ 17.  A day

---

[2] The "parity value" is the "highest number of shares of Common Stock issuable
upon conversion of ... [the] Default Sum" as of a date calculated in accordance
with the terms of the Note "multiplied by ... the highest Closing Price for the
Common Stock during the period beginning on the date of first occurrence of the
Event of Default and ending one day prior to the Mandatory Prepayment Date."
First & Second Notes, Art. III.

later, "Gayle Terry, an employee of ... OWOO's transfer agent, informed LG, via email, that OWOO did not 'have enough available shares to process [LG's] conversion.'" *Id.*, ¶ 19 (quoting an email from Gayle Terry, employee of Colonial Stock Transfer, to Nochum Greenberg of LG, dated Nov. 12, 2014, at 6:23 p.m. (included in Ex. E to the Complaint)). However, the Complaint implies that Terry's explanation is untrue, noting that the Form 10-Q which Defendant filed with the SEC for the quarter ending September 30, 2014 (attached to the Complaint as Exhibit G), states that "there were 48,869,166 outstanding shares of OWOO's Common Stock" on November 12, 2014—enough "to provide LG the conversion it sought." *Id.*, ¶ 36.

Second, the Complaint alleges that Defendant never provided it with written notice of the reverse stock split which allegedly caused the shortfall in reserves. *Id.*, ¶ 33(c). Plaintiff alleges that it first became aware of the 1:750 reverse split one year after it occurred, when Terry informed LG that its 15 million share reserve had been reduced to 20,000 shares. *Id.* (citing email from Gayle Terry to Nochum Greenberg of LG, dated Nov. 12, 2014, at 6:50 p.m. (included in Ex. E to the Complaint)). Although the Complaint claims that this was a "[b]reach of § 3.15," the Court notes that Defendant's failure to provide 20 days' advance notice of the reverse split would be an "Event of Default" under section 3.14 of the First and Second Notes.

10

Third, the Complaint alleges that, according to public records, Defendant had only 75,288,229 shares of Common Stock outstanding at the time Plaintiff sent the Notice of Conversion at issue. *Id.*, ¶ 26. According to Plaintiff's calculations, Plaintiff would have been entitled to 29,184,600 shares on the First Note alone if it had chosen to convert the entirety of the Note. *Id.* Plaintiff alleges that the inadequate reserves violated section 1.3 of the First Note, which required Defendant to have "authorized and reserved four times the number of shares that is actually issuable upon full conversion of the Note." *Id.*

Fourth and finally, the Complaint alleges that Defendant failed to repay the outstanding principal and interest on any of the three Notes. *Id.*, ¶ 33(a). The pleading states that the Maturity Dates for all three Notes had passed by the date on which the Complaint was filed. *Id.* Plaintiff alleges that the failure to repay the principal and interest by the Maturity Date constituted an Event of Default under section 3.1 of the Notes. *Id.*

The Complaint alleges seven claims for relief, which can be grouped into four categories. The first two claims for relief seek injunctive relief and damages stemming from Plaintiff's failure to deliver the 3,707,681 shares of Common Stock in response to the Notice of Conversion dated November 11, 2014. The third and fourth claims seek injunctive relief and damages relating to an anticipatory breach of Plaintiff's obligations to convert "the remainder of the Notes into shares of Common Stock." *Id.*, ¶ 54. The fifth and sixth causes of action allege that

11

Defendant tortiously converted shares to which it is entitled under the Notes, and seek injunctive relief and damages for that state-law tort. The seventh claim for relief seeks to recoup costs, expenses and attorneys' fees expended during this action.

In the Prayer for Relief on page 18 of its pleading, Plaintiff requests an order directing Defendant to deliver 3,707,681 of its Common Stock. Plaintiff also demands money damages in an amount of at least $140,000, as well as costs, expenses and attorneys' fees. Finally, Plaintiff seeks an order directing Defendant "to honor, in accordance with the agreements between the parties, all conversion requests hereafter duly submitted by LG to convert all or any portion of the Notes into shares of OWOO Common Stock ...."

C.  **The Procedural History of this Action**

At the same time it filed the Complaint on February 11, 2015, Plaintiff filed a motion for a preliminary injunction directing Defendant 1) to deliver immediately to Plaintiff the 3,707,681 shares of Common Stock, and 2) "to honor, in accordance with the agreements between the parties, all conversion requests hereafter duly submitted by LG to convert all or any portion of [the Notes] ...." *See* Order to Show Cause dated Feb. 12, 2015, pp. 1-2. Defendant did not respond to the motion. Accordingly, in an Order Entering Preliminary Injunction dated February 25, 2015, the Court directed Defendant to hold 3,707,681 shares of its Common Stock in escrow, and directed Plaintiff to serve its pleading on Defendant.

In compliance with this order, Plaintiff effected service by delivering a summons and a copy of the Complaint to Defendant's Executive Assistant on February 26, 2015. *See* Affidavit of Special Process Server dated Mar. 4, 2015. Defendant never answered or moved to dismiss the Complaint. In late March 2015, Plaintiff both requested a Certificate of Default pursuant to Fed. R. Civ. P. 55(a) and moved to hold Defendant in contempt for failing to place the 3,707,681 shares in escrow. After the Clerk of Court entered Defendant's default, Plaintiff's moved for a default judgment pursuant to Fed. R. Civ. P. 55(b). In electronic orders dated April 6, 2015, the Court referred both the contempt motion and the motion for a default judgment to Magistrate Judge Orenstein for a report and recommendation.

In early May 2015, Defendant moved to vacate the entry of default. The Court promptly referred that motion to the magistrate judge. On May 7, 2015, Judge Orenstein conducted a hearing at which he denied the motion to vacate. Defendant has not objected to or appealed that determination.

**D. The Report and Recommendation**

On August 6, 2015, Judge Orenstein issued a report and recommendation (the "R&R") with respect to the motion for a default judgment and the contempt motion. The R&R accepts as true all the well-pleaded allegations of the Complaint, except those relating to damages, and finds that those allegations are sufficient to establish that Defendant "breached the First Note by failing to reserve a sufficient number of shares for conversion, effectuating a reverse split of its common stock

without notice to LG, and failing to pay principal and interest ...." R&R, pp. 4-5. However, the R&R concludes that Plaintiff's pleading does not establish a breach of Plaintiff's conversions rights because the Complaint does not establish that Plaintiff "properly submitted a Conversion Notice on OWOO on November 11, 2014, in the contractually prescribed manner ...." *Id.*, p. 5.

Although the Court assumes familiarity with the R&R, the Court will briefly summarize the reasoning underlying the latter conclusion. First, the R&R observes that the First Note states that the obligation to convert principal and/or interest into securities arises only "[u]pon receipt by the Borrower from the Holder ... of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4." R&R, p. 6 (quoting First Note § 1.4(d)). Since the Notes define the Borrower as Defendant, the R&R concludes that the Notes "each require LG to properly submit a Conversion Notice to OWOO as a condition precedent to OWOO's duty to transfer shares." *Id.*, p. 5. Moreover, the R&R notes that Section 4.2 of the First Note requires that the Notice of Conversion be sent to OWOO's chief executive officer. *Id.*, p. 7.

Although the R&R concedes that the Complaint alleges that Plaintiff "duly submitted a Notice of Conversion to OWOO," the R&R maintains that this allegation is contradicted by documents in Exhibit D—the authority to which the Complaint cites in support of this allegation. Specifically, the R&R notes that page 2 of Exhibit D is "clearly addressed to DART Business Services, LLC." *Id.*, p. 6.

14

Assuming *sub silentio* that page 2 of Exhibit D is part of the Notice of Conversion, the R&R concludes that the Notice of Conversion was not submitted to Defendant and that "the contractual language is clear that OWOO's obligation to deliver shares would not arise unless and until LG delivered a Conversion Notice directly to OWOO's chief executive." *Id.*, p. 7.

Because the R&R concludes that Defendant has not breached its duty to deliver shares, the R&R recommends that the Court "award ... full monetary damages" and deny Plaintiff's motion for injunctive relief in its entirety. *Id.*, pp. 9-10. The R&R further recommends that the Court deny the contempt motion because it requests this "same kind of injunctive relief." *Id.*, p. 10. The R&R also recommends awarding attorney's fees and costs.

In calculating damages, the R&R correctly observes that Notes set forth "a variety of provisions that determine the amount of damages that LG can recover depending on the nature of OWOO's default." *Id.*, p. 8. The R&R asserts that, "[f]or most types of default," the Notes provide for the recovery of a "Default Sum" that is "calculated as a multiple of the sum of ... the outstanding principal on the Note, interest on the unpaid principal at an annual rate of eight percent from the date of issuance through the date of default, and ... 'Default Interest'—on both the unpaid principal and the unpaid interest described above—at an annual rate of 22 percent from the default date through the date of payment." *Id.*, p. 8. The R&R

concludes that the appropriate "multiplier for a breach of the obligation to reserve shares is two" with respect to the First Note. *Id.*

The R&R notes that under the Cross-Default provision in the Section 3.16 of the First Note, the breach of the First Note constitutes a breach of the other two Notes. *Id.*, p. 5. Accordingly, the R&R recommends awarding the Default Sum (with no multiplier) for the failure to timely repay the Second and Third Notes. *Id.*, p. 9. The R&R also recommends awarding attorney's fees and costs.

## E. The Objections

Plaintiff raises four objections to the R&R, while Defendant raises another two. First, Plaintiff argues that the well-pleaded allegations in the Complaint are sufficient to establish that Plaintiff duly submitted a Notice of Conversion and that Defendant breached its conversion obligations. Accordingly, Plaintiff argues, second, that the R&R should have granted a permanent injunction directing Defendant to deliver the 3,707,681 shares to Plaintiff and to honor all future conversion requests. Third, Plaintiff argues that "contempt sanctions" are appropriate because Defendant deliberately disregarded the Court's order to place the 3,707,168 shares in escrow.

Plaintiff's fourth objection and both of Defendant's objections relate to the calculation of damages. Plaintiff argues that the $2,000 per day default payments set forth in subsection 1.4(g) of the First Notes should have been awarded. Defendant objects to the use of the "2.0 Multiplier," arguing that this multiplier not

only violates New York's usury laws but violates public policy by imposing a penalty.

**DISCUSSION**

## I. Standard of Review

When, as here, a party timely serves and files written objections to a report and recommendation issued by a magistrate judge, the district judge must "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1), *see* Fed. R. Civ. P. 72(b)(3). "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3); *see* 28 U.S.C. § 636(b)(1). The district court is not required to review the factual or legal conclusions of the magistrate judge as to those portions of the report and recommendation to which no objections are addressed. *See Thomas v. Arn*, 474 U.S. 140, 150 (1985).

The objections raised by the parties in this case pertain, in large part, to Judge Orenstein's recommendations relating to Plaintiff's motion for a default judgment. "[A] party's default is deemed to constitute a concession of all well pleaded allegations of liability ...." *Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 158 (2d Cir. 1992). However, "a court need not ... accept as truth conflicting pleadings that make no sense, or that would render a

17

claim incoherent, or that are contradicted ... by statements in the complaint itself or by documents upon which its pleadings rely, or by facts of which the court may take judicial notice." *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405-06 (S.D.N.Y. 2001) (citing cases). In addition, a court "need not agree that the alleged facts constitute a valid cause of action." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (quoting *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)). Indeed, the Second Circuit has "suggested that, prior to entering default judgment, a district court is 'required to determine whether the [plaintiff's] allegations establish [the defendant's] liability as a matter of law.'" *Id.* (quoting *Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009)) (bracketed material added in *Mickalis Pawn Shop*).

"[T]he allegations in the complaint with respect to the amount of the damages are not deemed true." *Credit Lyonnais Sec. (USA), Inc. v. Alcantara*, 183 F.3d 151, 155 (2d Cir. 1999) (citing *Au Bon Pain*, 653 F.2d at 65). "Unless damages are certain, they must be proven in a post-default inquest where the defendant has an opportunity to contest the plaintiff's claims." *Norcia v. Dieber's Castle Tavern, Ltd.*, 980 F. Supp. 2d 492, 500 (S.D.N.Y. 2013) (citing *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974)). "The assessment of damages following entry of a default judgment in a diversity action is governed by state law standards." *Id.* (quoting *Hinckley v. Westchester Rubbish, Inc.*, No. 04-CV-0189, 2006 WL 2849841, at *4 (S.D.N.Y. Oct. 2, 2006)). Plaintiff bears the burden of

adducing admissible evidence to prove the damages "with reasonable certainty."
*See id.*

## II. Plaintiff's Objections

### A. The Breach of Defendant's Conversion Obligations

Plaintiff's first objection relates to that portion of the R&R which recommended that the Court find that the allegations in the Complaint failed to establish Defendant's breach of its conversion obligations. That recommendation was based on the finding that, although the Complaint alleged that Plaintiff had "duly submitted a Notice of Conversion to OWOO for a portion of the [First Note]," Complaint, ¶ 17, the document cited in support of this allegation—*i.e.*, the Notice of Conversion included in Exhibit D to the pleading—established that the Notice was sent to Defendant's transfer agent, not Defendant. Specifically, the R&R asserted that page 2 of Exhibit D established that the Notice of Conversion was "clearly addressed to DART Business Services, LLC." R&R, p. 6.

Exhibit D, however, includes two separate forms. The first page of Exhibit D is a completed version of the Notice of Conversion form attached to the Notes as Exhibit A. The second and subsequent pages of Exhibit D are an entirely different form: a pre-printed five-page form used to request that the share certificates be issued without a restrictive legend that would prevent their immediate resale. Since companies that have publicly traded securities typically use transfer agents to issue stock certificates, *see* www.sec.gov/fast-answers/answerstransferagenthtm.html,

that request was addressed to the transfer agent. Nothing in that request implies that the Notice of Conversion was also sent to the transfer agent or contradicts the Complaint's allegation that Plaintiff "duly submitted" the Notice of Conversion to OWOO.

To be sure, Defendant has adduced evidence to prove that the Notice of Conversion was, in fact, sent to the transfer agent. For example, in a declaration in support of Defendant's Memorandum of Law Objecting to the Request for Relief in Plaintiff's Motion for Default Judgment, Defendant's President and Chief Executive Officer states that "LG never served the Notice of Conversion upon OWOO" and that she only "recently learned that the Notice of Conversion was e-mailed by LG to the transfer agent ...." Declaration of Corinda Joanne Melton Objecting to the Request for Relief in Plaintiff's Motion for Default Judgment, ¶¶ 13, 15. However, because Defendant has defaulted, the Court can no longer consider this evidence relating to the question of whether Defendant breached its contractual duty to convert shares. *See Sec. & Exch. Comm'n v. Cole*, 661 Fed. App'x 52, 53-54 (2d Cir. 2016) (summary order) (liability argument foreclosed by default, which "required the court to accept as true the Complaint's factual allegations"). Rather, the Court must assume that Plaintiff's allegation that it duly submitted the Notice of Conversion to OWOO is true. *See Finkel*, 577 F.3d at 84; *Au Bon Pain*, 653 F.2d at 65.

20

For these reasons, the Court concludes that the Complaint's allegations are sufficient to establish that Defendant breached its obligation to convert principal and interest into shares of Defendant's Common Stock in response to the Notice of Conversion dated November 11, 2014. The Court, therefore, rejects that portion of the R&R which recommends denying Plaintiff's request for permanent injunctive relief altogether. Plaintiff's motion for a permanent injunction is granted to the extent of directing that the 3,707,681 shares currently being held in escrow pursuant to the Order Entering Preliminary Injunction be delivered to Plaintiff within three business days of the date of this Memorandum and Order.

**B. The Motion for Permanent Injunctive Relief**

Although the Court rejects that portion of the R&R which recommends denying Plaintiff's motion for a permanent injunction directing Defendant to deliver to Plaintiff the 3,707,681 shares of Common Stock currently held in escrow, the Court adopts the R&R to the extent that it recommends denying Plaintiff's request for a permanent injunction directing Defendant to comply with all future conversion requests. "An injunction is an exercise of a court's equitable authority," *Salazar v. Buono*, 559 U.S. 700, 714 (2010), and is "a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citing *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-312 (1982)). "The party requesting permanent injunctive relief must demonstrate (1) irreparable harm and ... (2) actual success on

21

the merits." *Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011). If a less drastic remedy is sufficient to redress a plaintiff's injury, recourse to the additional extraordinary relief of an injunction is not warranted. *See Monsanto*, 561 U.S. at 165-66.

In this case, Plaintiff has not made the requisite showing to obtain a permanent injunction directing Defendant to comply with all future conversion requests. While all three Notes provide that Plaintiff retains its conversion rights until Defendant pays the "Default Amount," All Notes at ¶ 1.1, there is no evidence that Plaintiff has made any attempt to exercise its conversion rights since November 11, 2014. Moreover, Defendant has never declared its intention not to abide by the conversion provisions of the Notes if Plaintiff files another Notice of Conversion. Accordingly, there is no evidence of a breach, or anticipatory breach, of contract that would necessitate any form of relief, much less injunctive relief.

Furthermore, even if there were evidence that Defendant would refuse to honor its conversion obligations in the future, there is no evidence that Plaintiff could not be made whole through an award of money damages. The Court will take judicial notice that, as of this writing, Defendant's stock is still publicly traded on the Nasdaq Stock Market.[3] Theoretically, Plaintiff could be made whole

---

[3] Defendant merged with Tonner Doll Company, Inc. in December 2015 to create Tonner One World Holdings Inc. As a result of the merger, Tonner shares were converted into equal numbers of One World shares, but the ticker symbol was changed from OWOO to TONR.

through an award of money damages sufficient to permit Plaintiff to purchase on the open market whatever number of shares Defendant improperly fails to deliver.

### C. Contempt Sanctions

Third, Plaintiff objects to that portion of the R&R which recommends that the Court deny Plaintiff's motion to hold Defendant and its Chief Executive Officer "in contempt of this Court's Order, dated February 25, 2015," which directed Defendant to place 3,707,681 shares of its Common Stock into escrow. That motion principally requested injunctive relief, demanding that the Court issue an order directing Defendant either to immediately deliver the shares to Plaintiff or to immediately place the shares in escrow. Plaintiff's Memorandum of Law in Support of its Motion for Contempt, pp. 7-8. The R&R noted that this was "the same kind of injunctive relief" requested in Defendant's motion for a permanent injunction, which the R&R also recommended denying.

Although the Court has rejected that portion of the R&R which recommends denying Plaintiff's request for permanent injunctive relief altogether, the Court nonetheless adopts that portion of the R&R which recommends denying the contempt motion. As the R&R correctly notes, the contempt motion principally seeks the injunctive relief requested in the motion for a permanent injunction. Since the Court is granting that injunctive relief to the extent of directing that the 3,707,681 shares be delivered to Plaintiff, *see* p. 21, *ante*, the motion is deemed moot. *See Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996) (per curiam) ("A

case is deemed moot where the problem sought to be remedied has ceased, and where there is 'no reasonable expectation that the wrong will be repeated.'")

### D. Damages

In its fourth and final objection, Plaintiff argues that it is entitled to the $2,000 per day default payments pursuant to § 1.4(g) of the First Note. Section 1.4(g) provides, in pertinent part:

> [I]f delivery of the Common Stock issuable upon conversion of this Note is more than three (3) business days after the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock.

Plaintiff reasons that because the R&R "err[ed] in finding that there was no breach by OWOO for failure to honor the November 11, 2014 Notice of Conversion ..., the default payments in §1.4(g) should be included in the damages calculation." Plaintiff Objections to the R&R, p. 12. Plaintiff does not, however, consider whether Defendant's failure to honor that Notice of Conversion was "due to the circumstances described in Section 1.3." First Note, § 1.4(g).

Section 1.3 of the First Note requires the Borrower "at all times to have authorized and reserved four times the number of shares that is actually issuable upon full conversion of the Note ...." This section further provides that "if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes

24

shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved ... for conversion of the outstanding Notes." The last sentence of Section 1.3 specifically provides that the failure to "maintain the Reserved Amount ... will be considered an Event of Default under Section 3.2 of the Note." Article III of the First Note specifies that "upon the occurrence and during the continuation of any Event of Default specified in Section 3.2, ... the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to ... the Default Sum ... multiplied by ... two." First Note, p. 13 (emphasis omitted).

In this case, the Complaint alleges, and an email exchange contained in Exhibit E to the pleading establishes, that the failure to honor Plaintiff's November 11, 2014, Notice of Conversion was due to circumstances described in Section 1.3. The Complaint specifically alleges that on November 12, 2014, Gayle Terry—an employee of Defendant's stock transfer agent—informed Plaintiff, via email, that Defendant did not "have enough available shares to process [LG's] conversion." Complaint, ¶ 19. One of Plaintiff's employees responded to Terry's email with incredulity, asking: "How can that be? [W]e have a TA letter with 15,000,000 shares reserve for this note." *Id.*, Ex. E, p. 1. Terry then explained: "The issuer had a 1:750 reverse split in January of 2014 which would have adjusted your

reserve to 20,000 post split shares." *Id.* This implied that when Defendant changed its capital structure, it failed to make proper provision to ensure adequate reserves.

Although the Complaint implies that Terry's explanation is untrue because Defendant had enough shares "to provide LG the conversion it sought," Complaint, ¶ 36, the Form 10-Q cited as authority for this allegation does not support it. According to page 1 of that SEC filing, there were 48,869,166 "outstanding shares" of Defendant's common stock on November 12, 2014. *See* Complaint, Ex. G, p. 1. However, "outstanding shares" are "shares that are currently owned by investors." https://www.nasdaq.com/investing/glossary/o/outstanding-shares. Accordingly, the number of outstanding shares does not indicate the number of shares available to Defendant to satisfy conversion requests.

In the absence of any evidence to the contrary, the Court has no reason to doubt Terry's representation that Defendant did not have enough Common Stock available on November 12, 2014, to honor Plaintiff's Notice of Conversion. Indeed, Plaintiff itself alleges that Defendant failed to maintain adequate reserves. *See* Complaint, ¶ 26. Since the failure to honor Plaintiff's Notice of Conversion was due to circumstances described in §1.3, Plaintiff was entitled to the remedy set forth in §3.2, not the remedy set forth in §1.4(g). The R&R recommended the appropriate measure of damages, awarding Plaintiff the Default Sum multiplied by two.

## II. Defendant's Objections

### A. Criminal Usury

Defendant objects to use of the "2.0 Multiplier," arguing that it 1) violates New York State usury laws and 2) violates public policy in the State of New York. In the first of these arguments, Defendant asserts that the use of the 2.0 Multiplier violates New York Penal Law §190.40. That section provides, in pertinent part, that a person is guilty of a class E felony when he or she "knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period." Defendant notes that the R&R recommends awarding Plaintiff $161,294.95 for breach of the First Note, and that this amount is approximately 260% percent of the $62,000 principal amount. Anticipating that Defendant would have to pay this amount about two years after receiving the initial $62,000 in July 2013, Plaintiff calculates that the $161,294.95 represents an 130% annual return and asserts, without citing to any case law whatsoever, that the 2.0 Multiplier violates Penal Law §190.40.

In its response to this argument, Defendant argues that "[i]t is well settled that criminal usury statutes do not apply to interest rates that are above the statutory maximum only after a default." Plaintiff's Reply to OWOO's Objections, p. 2. In support of that contention, Plaintiff relies primarily on *Manfra, Tordella & Brookes, Inc., v. Bunge*, 794 F.2d 61 (2d Cir. 1986), and three district court

opinions issued on or before June 6, 2014. Plaintiff argues that, because the 2.0 Multiplier applies only after a default, Defendant's argument is frivolous.

When Defendant briefed this issue in mid-September 2015, Defendant was unquestionably correct. At that time, numerous courts in this Circuit had "held that New York's usury laws do not apply to defaulted obligations." *See, e.g., Adar Bays, LLC v. Aim Expl., Inc.*, 285 F. Supp. 3d 698, 705 (S.D.N.Y. 2018); *Manfra*, 794 F.2d at 63 n.3) ("[U]sury law does not apply to defaulted obligations. Because interest was charged only on [defendant]'s past due debts, the usury laws do not apply."); *Prowley v. Hemar Ins. Corp. of Am.*, No. 1:05-CV-981 (KTD), 2010 WL 1848222, at *4 (S.D.N.Y. May 7, 2010) (citing *Manfra* for the proposition that "New York usury laws do not apply to defaulted obligations."); *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.*, 310 F. Supp. 2d 556, 562 (S.D.N.Y. 2003) ("[I]t is well established that the usury statutes do not apply to defaulted obligations."); *In re Vargas Realty Enters., Inc.*, 440 B.R. 224, 234 (S.D.N.Y. 2010) (N.Y. Penal Law § 190.40 "provisions regulating the maximum rate of interest do not apply to ... interest rates on defaulted obligations."). In New York State courts, there was also "abundant authority ... for the holding that there is no usury where an excessive rate of interest is made payable after maturity." *Phlo Corp. v. Stevens*, No. 00 Civ. 3619, 2001 WL 1313387, at *5 (S.D.N.Y. Oct. 25, 2001) (quoting *In re McCorhill Publishing, Inc. v. Greater N.Y. Savings Bank*, 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988)), *aff'd*, 62 Fed. Appx. 377 (2d Cir. 2003)). Several state courts had stated

that "the defense of usury does not apply where ... the terms of the mortgage and note impose a rate of interest in excess of the statutory maximum only after default or maturity." *Kraus v. Mendelsohn*, 97 A.D.3d 641, 641, 948 N.Y.S.2d 119, 120 (N.Y. App. Div. 2012) (quoting *Miller Planning Corp. v Wells*, 253 AD2d 859, 860, 678 N.Y.S.2d 340, 340 (N.Y. App. Div. 1998)).

Within the last 16 months, however, two district judges in the Southern District of New York have called into question this line of cases. In *Madden v. Midland Funding, LLC*, 237 F.Supp.3d 130 (S.D.N.Y. 2017), Judge Seibel concluded "that New York's criminal usury cap applies to prevent a creditor from collecting interest above 25% on a defaulted debt." *Id.* at 146. A few weeks later, Judge Sullivan, finding that Judge Seibel had "convincingly determined ... that the state criminal usury cap does apply to default interest," relied on *Madden* in holding that "the Court may not enforce a default interest rate that exceeded an overall effective interest rate of 25%." *Union Capital LLC v. Vape Holdings Inc.*, No. 16 Civ. 1343 (RJS), 2017 WL 1406278, at *8 (S.D.N.Y. Mar. 31, 2017)).

Unlike Judge Sullivan, this Court does not find the *Madden* analysis so convincing as to override the overwhelming authority to the contrary. *Madden* interpreted *Mantra* as standing only for the proposition that "[t]he civil usury cap does not apply to defaulted obligations," *id.* at 140, and noted that the New York Court of Appeals had yet to determine whether the criminal usury cap set forth in Penal Law § 190.40 would limit interest charged on defaulted debts to 25%

29

annually. The *Madden* opinion then examined various Appellate Division decisions which purportedly "held that, where a contract provision allows collection of interest at 'the highest interest permitted under the law,' New York's criminal usury cap applies to prevent a creditor from collecting interest above 25% even in default." *Madden*, 237 F. Supp. 3d at 142 (citing *815 Park Ave. Owners Corp. v. Lapidus*, 227 A.D.2d 353, 643 N.Y.S.2d 89, 90 (N.Y. App. Div. 1996); *Stein v. Am. Mortg. Banking, Ltd.*, 216 A.D.2d 458, 628 N.Y.S.2d 162, 164 (N.Y. App. Div. 1995); and *Emery v. Fishmarket Inn of Granite Springs*, 173 A.D.2d 765, 570 N.Y.S.2d 821, 824 (N.Y. App. Div. 1991)). *Madden* concluded that these decisions were "strong indicators that New York's criminal usury cap applies even to defaulted obligations," and pointed to a New York Supreme Court decision that allegedly "held outright that the interest on a defaulted mortgage above 25% was 'a criminally usurious rate.'" *Id.* at 142 (quoting *Emigrant Funding Corp. v. 7021 LLC*, 25 Misc.3d 1220(A), 901 N.Y.S.2d 906, 2009 WL 3530022, at *4 (N.Y. Sup. Ct. Oct. 26, 2009)).

The Court has carefully examined the three Appellate Division cases cited above. *815 Park Ave. Owners Corp.* held only that "the imposition of interest at the rate of 1.5% monthly was permissible" under a lease which required the defendant lessee to "pay interest ... at the maximum legal rate" upon default in payment of rent. 227 A.D.2d at 354; 643 N.Y.S.2d at 90. Similarly, *Stein* held that interest at the rate of 2% per month "was not in excess of the legal rate" set forth in

N.Y. Penal Law § 190.40 and could be awarded under a mortgage which provided that "the interest rate on any unpaid balance would increase to 2% per month, unless that rate was above the legal interest rate." 216 A.D.2d at 459; 628 N.Y.S.2d at 164. While both of these opinions assumed that the parties intended the contractual term, "maximum legal rate," to refer to the criminal usury cap of 25%, neither of these opinions had any occasion to address the question of whether interest on defaulted obligations could exceed the 25%.

*Emery*, which also centered on a question of contract interpretation, actually tends to undercut the argument in *Madden*. *Emery* involved an action to foreclose a purchase money mortgage which provided, *inter alia*, that "[f]ollowing a default, the mortgagee shall be entitled to the highest interest permitted under law." The Appellate Division noted that this provision was "poorly drawn" in that "it could be urged that virtually *any rate of interest is lawful* under a purchase money mortgage." 173 A.D.2d at 766, 570 N.Y.S.2d at 824 (emphasis added). However, the appellate court also recognized that "to construe the interest provision in the default clause of the purchase money mortgage between the plaintiffs and defendant mortgagors as containing no ceiling would render that provision so vague as to be meaningless." *Id.* Since it "appear[ed] that post-default interest was … intended to be capped by laws prohibiting usury," the court construed the phrase, "highest interest permitted under law," to mean 25% per annum.

31

*Emigrant Funding Corp.* is an unreported disposition by the Supreme Court

of the State of New York, Queens County, and of limited precedential value.

Relying on *Emery* and a 1917 New York Court of Appeals opinion, *Emigrant*

*Funding* states, without further analysis, that "[p]arties are free to agree that a

contract rate of interest shall increase upon default, so long as an interest rate is not

usurious or does not constitute a penalty." *Emigrant Funding*, 2009 WL 3530022,

at *4. However, neither *Emigrant Funding* nor the cases cited therein expressly

hold that New York's criminal usury laws prohibit interest above 25% on defaulted

debt obligations.

In contrast, *Madden* itself acknowledges that "several post-*Emery* decisions

can be read to suggest that the criminal usury cap does *not* apply to defaulted

obligations." 237 F. Supp. 3d at 143 (emphasis added). Although *Madden*

distinguishes three of these cases—*Hicki v. Choice Capital Corp.*, 264 A.D.2d 710,

694 N.Y.S.2d 750, 751 (N.Y. App. Div. 1999); *Miller Planning Corp. v. Wells*, 253

A.D.2d 859, 678 N.Y.S.2d 340, 340-41 (N.Y. App. Div. 1998); *Shorehaven*

*Assocs., Inc. v. King*, 184 A.D.2d 764, 587 N.Y.S.2d 190 (N.Y. App. Div. 1992)—

the Court notes that other district courts have relied on these same cases in holding

that the criminal usury statute does not apply to defaulted debts. *See, e.g., Beaufort*

*Capital Partners LLC v. Oxysure Sys., Inc.*, No. 16-CV-5176 (JPO), 2017 WL

913791, at *3 (S.D.N.Y. Mar. 7, 2017) (quoting *Miller Planning Corp.* and other

cases for the proposition that "the defense of usury does not apply where ... the

terms of the mortgage and note impose a rate of interest in excess of the statutory maximum only after default or maturity"). *Madden* also concedes that "many federal courts have applied *Manfra* to bar a claim or defense for usury" and cites to additional federal court decisions that can be read as stating that "the criminal usury cap does not limit interest rates charged on defaulted obligations." 237 F. Supp. 3d at 145 (citing *Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 340 (S.D.N.Y. 2013); *Sabella v. Scantek Med., Inc.*, No. 08-CV-453, 2009 WL 3233703, at *17 (S.D.N.Y. Sept. 25, 2009); *Urban Communicators PCS Ltd. P'ship v. Gabriel Capital, L.P.*, 394 B.R. 325, 341-42 (S.D.N.Y. 2008)). Although *Madden* implies that these decisions "contain statements about New York law that are at odds with New York state court decisions like *Emery*," *id.* at 146, the Court has already pointed out that *Emery* tends to undercut *Madden*'s reasoning. *See* p. 31, *ante*. Accordingly, the Court declines to follow *Madden* and holds that New York's criminal usury laws do not prohibit application of the 2.0 Multiplier.

**B. Public Policy**

In its second argument, Defendant asserts that the 2.0 Multiplier is a penalty and, therefore, "void as against public policy in the State of New York." Defendant's Objection to the R&R, p. 3. After citing to various cases which distinguish between liquidated damages clauses, which are enforceable, and penalty clauses, which are not, Defendant simply asserts that the 2.0 Multiplier is "a penalty against OWOO, which has no logical, reasonable or justifiable relation to

33

the principal due." *Id.* Defendant does not engage in any further discussion of the Notes or how the Notes' other provisions relate to the 2.0 Multiplier.

In its response, Plaintiff tacitly assumes that the 2.0 Multiplier is a liquidated damages provision. However, Plaintiff notes that Defendant's argument subtly misstates the appropriate legal standard, which actually provides that liquidated damages are a penalty only if they are "plainly or grossly disproportionate to the probable loss." Plaintiff's Reply, p. 3. Citing to the provisions of the Notes, Defendant then argues that "a 2.0 multiplier is clearly proportionate to the minimum loss suffered by a breach of the agreement[s]." *Id.*, p. 4.

"Liquidated damages constitute ... compensation which, the parties have agreed, should be paid in order to satisfy any loss or injury flowing from a breach of their contract." *Truck Rent-A-Ctr., Inc. v. Puritan Farms 2nd, Inc.*, 41 N.Y.2d 420, 423-24, 393 N.Y.S.2d 365, 368 (1977). In effect, liquidated damages are "an estimate, made by the parties at the time they enter into their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement." *Id.*, 41 N.Y.2d at 424, 393 N.Y.S.2d at 368. A "liquidated damage provisions will not be enforced if it is against public policy to do so and public policy is firmly set against the imposition of penalties or forfeitures for which there is no statutory authority." *Id.*, 41 N.Y.2d at 424, 393 N.Y.S.2d at 369. "If ... the amount fixed 'is plainly or grossly disproportionate to the probable loss,' the provision is a

34

penalty clause and will not be enforced." *Spirit Locker, Inc. v. EVO Direct, LLC*, 696 F. Supp. 2d 296, 304 (E.D.N.Y. 2010) (quoting *Truck Rent–A–Center*, 41 N.Y.2d at 425, 393 N.Y.S.2d at 365).

Assuming that the provision at issue in this case is a liquidated damages provision, it is not plainly or grossly disproportionate to the probable loss. The 2.0 Multiplier applies only when Defendant breaches its duty to convert principal and interest accrued under the Notes into shares of OWOO's Common Stock. *See* First Note §§ 1.3 & 3.2 and Article III. Absent such a breach, Plaintiff would be entitled to recover shares worth twice the amount of principal and interest, since the Notes all provide that the Conversion Price will be 50% of the Market Price. All Notes, § 1.2(a). Theoretically, Plaintiff could immediately sell those shares and double its principal and interest. Accordingly, the 2.0 Multiplier is not a penalty, but essential in order to make Plaintiff whole.

## CONCLUSION

For the reasons set forth above, Magistrate Judge Orenstein's report and recommendation dated August 6, 2015, is adopted, except with respect to that portion which recommended the denial of permanent injunctive relief. The Court directs that within three business days of the date of this Memorandum and Order, Defendant shall deliver to Plaintiff the 3,707,681 shares of Defendant's Common Stock which this Court, in its Order Entering Preliminary Injunction, directed be held in escrow. Since the delivery of these shares will reduce the principal and

interest owed by Defendant to Plaintiff on the First Note, and since the amount of

Regular and Default Interest must be recalculated, this matter is returned to

Magistrate Judge to determine damages.

SO ORDERED:

/s/(SJ

Dated: June 22, 2018
       Brooklyn, New York                    Sterling Johnson, Jr., U.S.D.J.